**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLORADO**

Civil Action No.1:07-cv-00968-REB-CBS
(Consolidated with Nos. 07-cv-00971-REB-CBS; 07-cv-01087-REB-CBS; 08-cv-02298-REB-CBS; 08-cv-02437-REB-CBS; 09-cv-00835-REB-CBS; 09-cv-01145-REB-CBS)

TRUDIE M. ISKOWITZ, *et al.*,

    Plaintiffs,

    v.

CESSNA AIRCRAFT COMPANY, *et al.*,

    Defendants.

---

**UNITED STATES' MOTION FOR SUMMARY JUDGMENT AND
MEMORANDUM BRIEF IN SUPPORT THEREOF**

---

## I.  INTRODUCTION

This wrongful death action arises from the crash of a Cessna Aircraft business jet on approach to the Pueblo, Colorado, airport on February 16, 2005.  The undisputed evidence shows that the accident was caused by the pilots' failure to maintain a safe airspeed, which resulted in a loss of control and crash.  Accordingly, the United States respectfully moves for summary judgment on Plaintiffs' claims that the air traffic controller in communication with the aircraft at the time of the accident breached his duty to provide adequate and safe air traffic control services.[1]  Summary judgment is

---

[1] The United States is a named defendant only in *Iskowitz* (07-cv-971), *Coffman* (07-cv-968) and *Wightman* (08-cv-2437).  The United States is not a defendant in *Winston* (07-cv-1087) or *Walton* (09-cv-1145).  Pursuant to the United States' Notices of Removal and Substitution (Doc. 1), the United States should be substituted for the individually named FAA defendants as a matter of law under the Federal Tort Claims

appropriate because Plaintiffs are unable to establish that any of the alleged acts or omissions of the Federal Aviation Administration controller were a proximate cause of the accident. The undisputed facts show that the crash was solely due to the pilots' loss of control of the aircraft after they failed to maintain the required minimum safe approach speed as it neared the Pueblo airport. The obligation to fly the aircraft at a safe airspeed was solely that of the pilots, and none of the controller's alleged acts or omissions prevented them from doing so.[2]

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment motions isolate and dispose of factually unsupported claims, avoid unnecessary trials, and promote speedy judgments. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). When a party moves for summary judgment on an issue upon which the opposing party bears the burden of proof, the moving party's burden is satisfied by showing an absence of evidence in the record to support the non-moving party's case. *Celotex Corp.*, 477 U.S. at 324-25. The burden then shifts to the non-moving party to make a showing sufficient to establish a genuine issue of material fact. *Concrete Works, Inc. v. City and County of Denver,* 36 F.3d 1513, 1518 (10th Cir. 1994).

In making its showing, the non-moving party may not rest upon the mere allegations of the pleadings; it must establish, through admissible evidence, the

---

Act. The United States is the only proper defendant in an FTCA suit. 28 U.S.C. § 1346(b) and § 2679, *et seq.*; *United States v. Smith*, 499 U.S. 160, 167 n.9 (1991).

[2] On April 1, 2010, the United States filed a motion to dismiss Plaintiffs' claims for negligent staffing, training, and supervision against the FAA because the Court lacks subject matter jurisdiction over those claims. *See* Doc. 184.

existence of a genuine issue of material fact. Fed. R. Civ. P. 56(e); *see also Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (the non-moving party cannot defeat summary judgment by merely demonstrating "that there is some metaphysical doubt as to the material facts"). "An issue is 'genuine' only if the evidence is such that a reasonable fact finder could return a verdict for the nonmoving party." *Penrod v. Zavaras*, 94 F.3d 1399, 1402 (10th Cir. 1996). A fact is material when, under the governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The non-moving party must "go beyond the pleadings and by [his or] her own affidavits, or by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp.*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). Where the moving party demonstrates that there is no material evidence to support the non-moving party's claims, or where there is no genuine issue as to any material fact, summary judgment must be granted. *Penrod*, 94 F.3d at 1402.

### III.   STATEMENT OF UNDISPUTED MATERIAL FACTS

1. On February 16, 2005, at about 9:13 a.m. MST,[3] passengers Aaron R. Iskowitz, David J. Coffman, and co-pilot Jeffrey Wightman suffered fatal injuries when the Cessna Citation 560 jet (N500AT), owned by Circuit City Stores, operated by Martinair, Inc., crashed during its approach about four miles east of the runway

---

[3] On February 16, 2005, Coordinated Universal Time (UTC) was seven hours ahead of Mountain Standard Time (MST). To convert MST to UTC, add seven hours; thus 9:13 MST is 1613 UTC.

       at Pueblo Municipal Airport.  Doc. 3, *Iskowitz* and *Coffman,* Amended Complaints, ¶¶ 12,19, 21 and 22; Doc. 97, *Wightman v. USA* Complaint, ¶¶ 6, 8-9, and Doc. 123, *Wightman v. Cessna* Complaint, ¶¶ 9-10.

2. The accident aircraft was piloted by Bruce Walton and Jeffrey Wightman, the two-pilot crew employed by Martinair.  The Cessna Citation 560 was certified by the FAA to fly in known icing conditions.  Doc. 3, ¶¶ 16-18.

3. The flight began in Richmond, Virginia, and had made a fuel stop in Columbia, Missouri, before it departed for Pueblo, Colorado, to refuel.  Doc. 3, ¶ 18.  It departed and flew with another Circuit City Cessna Citation 560 jet (N500FK) ("sister ship").

4. As N500AT descended toward the Pueblo airport to land, its indicated airspeed decreased below that required in order for the pilots to maintain controlled flight.[4]  Ex. A8, Holby Expert Rpt., pp. 9-12, 14.

5. The decrease in indicated airspeed resulted in a stall[5] and a loss of control from which the pilots could not recover, and the aircraft impacted the ground.  Ex. A8, Holby Expert Rpt., pp. 8-10.

6. It was the pilots' responsibility, not the air traffic controller's, to ensure that the aircraft's indicated airspeed did not deteriorate to the point at which the

---

[4] Indicated airspeed is that speed in nautical miles per hour that the pilots would have seen on the aircraft's airspeed indicator.  1 knot equals 1.15 statute miles.

[5] An aerodynamic stall occurs when the wings lose their ability to produce sufficient lift, which can result in a significant loss of altitude and/or the ability to control the aircraft.

aircraft would lose control or stall. Ex. A5, Daley Dep., 167:23–168:6; Ex. A4, Holby Dep., 256:14-23.

7. On its approach four miles from the runway, the aircraft should not have been flown at an indicated airspeed any lower than approximately 114 knots (*i.e.*, its approach airspeed).[6] Ex. A4, Holby Dep., 184:14-23, 185:3-17; Ex. A5, Daley Dep., 107:24-109:9, 110:9-13, 114:11-16; 115: 1-5 (Captain should have known 96 knots was not an appropriate approach speed and should have increased speed to stay above 96 knots).

8. The loss of control occurred at an indicated airspeed below approximately 96 knots. Ex. A8, Holby Expert Rpt., pp. 1, 11, 12, 14; Ex. A4, Holby Dep., 193:8-18.

9. Had N500AT been flown at an indicated airspeed of 114 knots or above, as it had been doing on its descent, the loss of control would most likely not have occurred. Ex. A5, Daley Dep., 110:9 -13 (the accident would not have happened had the crew maintained 114 knots); Ex. A4, Holby Dep., 193: 8-18.

---

[6] 114 knots should have been the indicated airspeed at which the crew flew the aircraft on its approach. It is calculated by using the aircraft's Vref (reference speed) found in the Cessna 560 Aircraft Flight Manual, which the pilots determined was 96 knots. The pilots were required to correct the Vref speed when flying in known icing conditions by adding 7-8 knots. (The presence of ice on the leading edges of a wing increases the airspeed at which the aircraft will stall.) To that "corrected Vref," Martinair's operating procedures required that 10 additional knots be added to obtain the approach speed. Ex. A8, Holby Expert Report, pp. 4, 6, 9-14; Ex. A5, Daley Dep., 107:24-109:9.

10. The pilots of N500AT were solely responsible for maintaining control of the aircraft while it was in flight.  Ex. A4, Holby Dep., 256:9-13; 14 C.F.R. § 91.3(a).[7]

11. At the time of the loss of control, the pilots of N500AT were in communication with Randy Neu, a fully certified professional air traffic controller qualified to work all positions in the Pueblo tower.  Ex. A1, Burgess Dep., 28:12-29:1, 36:11-14, 41:25-42:11; Ex A2, Neu Dep., 42:12-19.

12. Mr. Neu was providing air traffic control services to N500AT, its sister ship N500FK, and a Skywest (6431) passenger jet holding over the Pueblo airport, from the FAA-run tower facility at the airport.  Ex. A7, ATC Factual Report, pp. 7-8; Ex. A3, FAA Certified Transcript of Air Traffic Control communications 1600-1620 UTC (ATC Tr.).

13. Because of clouds, Neu never saw N500AT.  From the tower, during his communications with N500AT, Neu could only view its radar target[8] shown on the radar scope.  Ex. A7, ATC Factual Report, pp. 7-8; Ex. A1, Burgess Dep., 29: 22-25, 40:19-41:13.

---

[7]Section 91.3(a) of the Federal Aviation Regulations provides:  "The pilot in command of an aircraft is directly responsible for, and is the final authority as to, the operation of that aircraft."

[8]"Target" is a digital display by means of computer-generated symbols, together with alphanumerics including altitude information, ground speed, and flight plan data displayed on the DBRITE or radar scope in the Pueblo tower for an aircraft's location.

14. The radar in the Pueblo ATC Tower could not detect or display clouds or the presence of icing conditions. Ex. A2, Neu Dep., 76:12-14; Ex. A1, Burgess Dep., 120:17-24.

15. The communications between the pilots, as well as their communications with ATC, were recorded. Ex. A6 (Transcript of Cockpit Voice Recording (CVR Tr.) from the NTSB's CVR Group Chairman's Report); Ex. A3, FAA Certified ATC Tr.

16. Prior to the loss of control, the pilots of N500AT were aware that they were flying in icing conditions and had ice present on the leading edges of their wings. Ex. A6, CVR Tr., pp. 12, 21 and 27. On the Cockpit Voice Recorder (CVR) the pilots indicate that the captain activated the deice boots between 8:54:18 a.m. and 8:58:20 a.m., and there is no indication that the de-ice boots were operated again. Ex. A5, Daley Dep., 72:10-14, 154:18-156:2; Ex. A6, CVR Tr., pp. 7-27.

17. Just prior to the stall, the First Officer asked the Captain if he wanted to cycle the deice boots, saying: "I don't know if you want to run your ice a little bit. You got the Vref there." Ex. A6, CVR Tr., p. 27.

18. At 9:12:56 (1612:56 UTC), when the Minimum Safe Altitude Warning (MSAW) activated on the Pueblo radar scope, Neu issued a safety alert to N500AT: "Citation zero alpha tango altitude alert altitude indicates four thousand niner hundred over." Ex. A3, ATC Tr., p.7; Ex. A1, Burgess Dep., 65:18-20.

19. Before the aircraft departed Richmond that morning, the National Weather Service had issued an Airmen's Meteorological Information (AIRMET[9]), which

---

[9]An AIRMET is an advisory forecast of certain weather phenomena that are of operational interest to all aircraft.

forecast for the Pueblo area that conditions would be present for icing, *i.e.*, occasional moderate rime and/or mixed icing in the clouds and precipitation between the freezing level (*i.e.*, the ground) and 22,000 above sea level.

20. N500AT's pilots were aware of the forecast for icing conditions around Pueblo before they departed Columbia, Missouri. Ex. A5, Daley Dep. 83:14-22.

21. Prior to the loss of control of N500AT, the pilots were aware of the weather conditions at the Pueblo airport, which were provided by Neu and the ATIS broadcast "Juliet."[10] Ex. A6, CVR Tr., pp. 17 and 22.

22. Mr. Neu did not provide any pilot reports (PIREPs) of icing from the three aircraft landing earlier at Pueblo to N500AT. Ex. A2, Neu Dep., 57:7-9; Ex. A5, Daley Dep. 234:19-24.

23. That a PIREP of icing conditions was not communicated to N500AT did not affect the speed at which the aircraft was flown because the pilots, and not the air traffic controller, were responsible for ensuring that a safe airspeed was being maintained. Ex. A5, Daley Dep., 167:23 -168:6; 234:10-24; Ex. A4, Holby Dep., 256:14-23.

24. The presence of ice on the wings required that the pilots fly the aircraft at a higher airspeed than without the presence of ice on their wings. Ex. A5, Daley Dep., 108:19-109:3.

---

[10]The pilots received ATIS (Airport Traffic Information System) information Juliet, which was recorded at 1453 UTC and stated that the winds at the airport were 060 degrees at 6 knots, visibility was 10 statute miles, the base of the clouds (ceiling) was at 1,400 feet above the ground and the temperature was -3 degress (Celsius) with a dew point of -5 degrees. Ex. A7, p. 4.

## IV. ARGUMENT

**SUMMARY JUDGMENT IS APPROPRIATE BECAUSE PLAINTIFFS CANNOT ESTABLISH THAT THE ACTIONS OF THE CONTROLLER WERE THE PROXIMATE CAUSE OF THE ACCIDENT.**

### A.   Burden of Proof and Elements.

Under the Federal Tort Claims Act, the substantive law of the state where the alleged negligent act or omission occurred applies, which in this case is Colorado law. 28 U.S.C. § 1346(b)(1). Plaintiffs bear the burden of proving all four elements of a negligence claim: (1) legal duty; (2) breach of that duty; (3) proximate cause; and (4) damages. *Keller v. Koca*, 111 P.3d 445, 447 (Colo. 2005); *Walcott v. Total Petroleum, Inc.*, 964 P.2d 609, 611 (Colo. Ct. App. 1998); *Miller v. United States*, 463 F.3d 1122 (10th Cir. 2006).

With respect to Plaintiffs' air traffic control allegations, the United States does not concede that Mr. Neu breached any legal duty of care to the Plaintiffs. However, for purposes of this Motion only, assuming that Mr. Neu breached any such duty, Plaintiffs are nevertheless unable to establish that the breach was the proximate cause of their injuries.

Under Colorado law, "the test for causation in a negligence action is the 'but for' test." *Smith v. State Comp. Ins. Fund*, 749 P.2d 462, 464 (Colo. App. 1987). This test is satisfied only when a defendant's conduct "in a natural and continued sequence, unbroken by an efficient, intervening cause, produces the results complained of, and without which that result would not have occurred." *Id.* The Colorado Jury Civil Jury Instructions similarly define "cause" to mean "an act or failure to act which in natural

9

and probable sequence produced the claimed injury. It is a cause without which the claimed injury would not have happened." CJI-Civ, 9:18 (2008).

**B.     Undisputed Material Facts.**

See Section III, Statement of Undisputed Material Facts, pp. 3-8.

**C.     Plaintiffs Cannot Prove that the Air Traffic Controller's Actions Proximately Caused the Accident.**

Plaintiffs cannot establish that the air traffic controller proximately caused the accident. Because the accident was caused by the pilots' failure to maintain a safe airspeed on final approach (which led to a catastrophic loss of control), the accident was not caused by the controller's alleged failure to relay icing reports, his alleged improper approach procedures, or his alleged failure to issue a timely low-altitude safety alert.

**D.     Discussion**

Plaintiffs do not dispute that this accident was caused by the failure of the crew of N500AT to maintain a safe airspeed while flying their approach to the Pueblo airport. Simply put, had the crew maintained an indicated airspeed of 114 knots or greater while flying toward Pueblo, this accident would not have occurred. Section III above, ¶ 9. Plaintiffs are unable to adduce any evidence that would establish that the acts or omissions of the air traffic controller in communication with N500AT affected its airspeed while on the approach. Moreover, it was the primary duty of the flight crew to maintain a minimally safe flying speed for the conditions that were present during their approach to Pueblo. The air traffic controller was not responsible for monitoring or ensuring that N500AT flew at a safe airspeed. Section III, ¶ 6.

### 1. The Lack of a PIREP Did Not Contribute to the Accident.

Plaintiff's ATC expert, Richard P. Burgess,[11] argues that the Pueblo tower controller breached a duty to Plaintiffs by failing to provide N500AT's flight crew with previous icing PIREPs from aircraft that landed at Pueblo earlier in the morning. He had no understanding, however, of what "caused" the crash, stating that "I'm not an expert in that area." Ex. A1, Burgess Dep., 120:25-121:8. Assuming that the controller breached a duty to Plaintiffs, the failure to relay pilot reports to N500AT could not have been the legal cause of this crash because both pilots had already encountered and *knew* icing conditions were present prior to and after contacting the Pueblo tower during their final approach. This lack of a causal connection was confirmed by Plaintiffs' pilot expert, Edward Daley, who was retained to determine the cause of the crash. Ex. A5, Daley Dep., 52:18-53:3. Daley admitted that he did not cite the absence of PIREPs for icing as a contributing factor to this accident because "it was apparent from the CVR that [the pilots] knew they were in icing." *Id.* at 234:10-24.

Plaintiffs do not dispute that N500AT's pilots knew about the forecasted icing conditions for Pueblo (*i.e.*, the AIRMET for icing), that weather conditions at Pueblo were conducive to icing (ATIS Juliet), or that the pilots were on the ATC frequency when Skywest's pilot reported "getting a little ice here and there." Ex A3, ATC Tr., p. 6. More importantly, it is undisputed that both pilots knew they were in *actual* icing conditions more than five minutes before they contacted the controller in Pueblo, *because the captain activated the deice boots*. The pilots' knowledge of icing

---

[11] Mr. Burgess is the only air traffic control expert designated by Plaintiffs in this consolidated action.

conditions continued during their descent and approach up to the instant before the mishap, when the co-pilot suggested that the captain activate the deice boots; "I don't know if you want to run your ice a little bit. You got the Vref there." Ex. A6, CVR Tr., pp. 22-27.

Even assuming a breach of duty (by failing to pass on earlier PIREPs of icing), this omission cannot, as a matter of law, be said to have legally caused this accident because the pilots had real time knowledge of icing conditions prior to their arrival, before contacting Pueblo tower and throughout their approach up to the time of the mishap.

The pilot is primarily responsible for the safe operation of the aircraft. *Somlo v. United States*, 274 F. Supp. 827, 843 (N.D. Ill. 1967), *aff'd*, 416 F.2d 640 (7th Cir. 1969) (finding pilot solely at fault in airplane accident caused by icing). As a matter of law, the pilot in command of the airplane is directly responsible for, and is the final authority as to, the operation of the airplane. 14 C.F.R. § 91.3(a).

There is no duty to warn a pilot of a condition that the pilot should already be aware of based on his training, experience, and personal observations. *Hunter v. United States*, 961 F. Supp. 266, 270 (M.D. Fla. 1996).

> Nothing a [controller] does relieves a pilot of his duties and responsibilities. A [controller] has no duty to inform a pilot of that which the pilot should already know. A controller's duty to warn does not relieve the pilot of his primary duty and responsibility. The pilot has a continuing duty to be aware of danger when he can gather adequate information with his own eyes.

*Srock v. United States*, 462 F. Supp. 2d 812, 825-826 (D. Mich. 2006) (internal citations and quotations omitted).

Plaintiffs' arguments on causation are based entirely on speculation, not fact. *See generally Spurgin-Dienst v. United States*, 359 F.3d 451, 455-56 (7th Cir. 2004) (holding that FAA Flight Service Station briefer's failure to provide pilots with certain weather reports was not the proximate cause of accident because plaintiffs could only speculate that the information would have caused the pilot to fly a different route). Plaintiffs cannot, as a matter of law, establish that N500AT pilots' non-receipt of the prior PIREPs from the Pueblo controller was a proximate cause of the accident because the pilots had superior knowledge of the actual icing conditions from their own eyes. Moreover, the lack of a PIREP was not related to the pilots' slowing the plane to an unsafe speed on their approach.

### 2.     The Timing of the Air Traffic Controller's Safety Alert Did Not Cause or Contribute to the Accident.

Plaintiffs claim the Pueblo air traffic controller breached his duty to Plaintiffs by failing to issue a safety alert as required by ¶ 2-6-1 of the ATC manual. Doc 3, ¶ 43(c). A safety alert is issued by ATC when, in the controller's judgment, an aircraft is at an altitude which places it in unsafe proximity to terrain. Plaintiffs' ATC expert opines that the safety alert issued by the controller at 1612:56 UTC was not timely. Ex. A1, Burgess Dep., 65:18-20, 82:6-17; Ex A3, FAA Tr., p. 7. The sole basis for the claim of alleged untimeliness is that the Pueblo controller informed the pilot of the low altitude *after* the MSAW[12] alert went off on his radar scope. Ex. A1, Burgess Dep., 82:6-17.

---

[12]Minimum Safety Altitude Warning Alert (MSAW) - A function of the Pueblo air traffic radar systems' computers (ARTS IIA, Ex. A7, ATC Factual Report, p. 4, Notes 7, 8) that aids the controller by alerting him when a tracked aircraft is below or is predicted by the computer to go below a predetermined minimum safe altitude.

Plaintiffs' ATC expert argues that Mr Neu should have advised the pilots of their low altitude (*i.e.*, issue a safety alert) *before* he observed the MSAW alert on the radar scope, as soon as [the controller] saw that the aircraft's altitude went below 1,200 feet above ground level (agl).[13]  Ex. A1, Burgess Dep., 63:22-64:11, 65:24-66:7, 76:20-77:23.

There was a 16-second window between the time the aircraft stalled at 1612:40 UTC and the controller's issuance of the safety alert at 1612:56.  The aircraft stalled 400 feet *above* the altitude where Plaintiffs' ATC expert claims a safety alert was warranted.  Ex. A8, Holby Rpt., p. 10.  The ATC manual actually only required Mr. Neu to issue the safety alert when he was aware that the aircraft was at an "altitude which, in [his] judgment place[d] it in unsafe proximity to terrain . . ."  Ex. A9, ATC Manual, ¶ 2-1-6.  Due to the limitations of the terminal radar equipment, the controller is only provided with an update of an aircraft's position once every 4.6 seconds.  Ex. A1, Burgess Dep., 71:6-9.  Under these circumstances, it was impossible for the controller to have issued the low-altitude alert any sooner or in enough time to have helped the pilots prevent the crash.  Even if a safety alert had been issued within 10 seconds of the stall (*i.e.*, within about two radar sweeps), Plaintiffs are unable to offer any admissible evidence that such a warning would have prevented the crash.

Only expert opinion testimony that is relevant and reliable is admissible.  *See e.g., Daubert v. Merrill Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993); Fed. R. Evid. 702.

---

[13] 1,200 feet above ground level is converted to Mean Sea Level (MSL), by adding the field elevation, which was 4,600 feet at the accident site. 1,200 feet agl equals 5,800 feet msl.  Ex. A1, Burgess Dep., 81:6-13.

To be reliable, expert testimony must be "based on facts which enable [the expert] to express a reasonably accurate conclusion *as opposed to conjecture or speculation*." *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003) (emphasis added). "[E]xpert testimony must have a traceable, analytical basis in objective fact before it may be considered on summary judgment." *Bragdon v. Abbott*, 524 U.S. 624, 653 (1998); *see also Mitchell v. Gencorp, Inc.*, 165 F.3d 778, 781-82 (10th Cir. 1999) (affirming summary judgment as plaintiff's experts lacked reliable factual basis for opinions on causation).

Mr. Burgess' opinion that the safety alert was untimely amounts to nothing more than unsubstantiated conjecture, and is unsupported by any basis in fact, because he never determined:  when the MSAW alert was first displayed on the Pueblo controller's radar scope;  when, prior to 1612:56 UTC, the Pueblo controller should have issued a safety alert; or, how long it would take an airplane experiencing a stall to lose sufficient altitude to be detectable on the Pueblo ATC radar.  Ex. A1, Burgess Dep., 66:23-67:13; 73:21-74:1; 79:12-15.

Similarly, Plaintiffs' allegation that the Pueblo tower controller should have provided an earlier altitude alert is unrelated to the pilots' failure to maintain a safe airspeed.  Again, the crew's failure to maintain adequate airspeed constitutes the sole proximate cause of the accident under Colorado law.  Once the aircraft reached an insufficient airspeed and departed from controlled flight, the crew was clearly aware of

the situation[14] and needed no warning from the controller that the aircraft was in close proximity to terrain. Ex. A8, Holby Rpt., pp. 1, 10.

### 3. Plaintiffs Cannot Prove Causation as a Matter of Colorado Law.

Because the cause of the accident is uncontroverted, causation becomes a question for the court. *City of Westminster v. Centric-Jones Constructors*, 100 P.3d 472, 485-86 (Colo. Ct. App. 2005) (citing *Smith v. State Comp. Ins. Fund*, 749 P.2d 462, 464 (Colo. Ct. App. 1987)) ("If 'facts are undisputed and reasonable minds could draw but one inference from them, causation is a question of law for the court'"). As the Tenth Circuit recently stated, "to survive summary judgment, the party bearing the burden of proof at trial on a dispositive issue must go beyond the pleadings and designate specific facts so as to make a showing sufficient to establish the existence, as a triable issue, of an element essential to that party's case." *Dimitruk v. George & Sons' Repair Shop, Inc.*, 217 F. App'x. 765, 769 (10th Cir. 2007).

A finding that Plaintiffs are unable to prove proximate causation is proper because, regardless of Mr. Neu's alleged actions, the pilots' reduction in airspeed was an unforeseeable intervening cause of the accident. Neither Mr. Neu, nor any reasonable controller in his position, could have foreseen that the crew of N500AT would allow the aircraft's airspeed to deteriorate to a dangerous level. The record does

---

[14]Plaintiffs also cannot prove that the controller had any more knowledge than the crew about the aircraft's proximity to terrain. Due to the limitations of the terminal radar equipment, the controller is provided with an update of an aircraft's position only once every 4.6 seconds. Ex. A1, Burgess Dep., 71:6-9. The pilots, of course, had all the instruments in their cockpit to alert them to their flight altitude in real time.

not support any assertion that Mr. Neu's alleged actions created or increased the risk that the crew would fail to maintain a minimally safe airspeed that could be found to have played a substantial role in causing the loss of control.

Although Plaintiffs' claims involving inadequate staffing, training, and supervision are barred by the discretionary function exception as set forth in the United States' Motion to Dismiss (Doc. 184), those claims would also fail for lack of proximate cause. Plaintiffs have no evidence to establish that any of these alleged deficiencies caused the aircraft to be flown at an unsafe airspeed. Should the Court determine that it does have subject matter jurisdiction over these additional allegations, the United States would still be entitled to summary judgment because of Plaintiffs' failure to prove proximate cause.

Accordingly, the Court should enter summary judgment in favor of the United States on Plaintiffs' allegations of air traffic control negligence.

## V.  CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court enter judgment in its favor.[15]

Respectfully submitted this 5th day of April, 2010.

| | |
|---|---|
| TONY WEST<br>Assistant Attorney General | DAVID M. GAOUETTE<br>United States Attorney |
| s/*Colleen Conlin*<br>Trial Attorney<br>Department of Justice<br>Post Office Box 14271<br>Washington, D.C. 20044-4271<br>colleen.conlin@usdoj.gov | s/*Mark S. Pestal*<br>Assistant United States Attorney<br>1225 17th Street, Suite 700<br>Denver, Colorado 80202<br>(303) 454-0101<br>mark.pestal@usdoj.gov |

---

[15]**Certificate of Compliance**.  The undersigned certify that this motion complies with the Court's practice standards.  REB Civ. Practice Standard V.I.4.

## CERTIFICATE OF SERVICE (CM/ECF)

I hereby certify that on April 5, 2010, I electronically filed the foregoing with the Clerk of Court using the ECF system which will send notification of such filing to the following e-mail addresses:

Michael S. Burg , Esq.        (msburg@burgsimpson.com)
Rosemary Orsini, Esq.         (rorsini@burgsimpson.com)
Brian K. Matise, Esq.         (bmatise@burgsimpson.com)
Donald J. Nolan, Esq.         (djn@nolan-law.com)
Thomas Routh, Esq.            (tpr@nolan-law.com)
*Attorneys for Iskowitz/Coffman*

Thomas A. Demetrio, Esq. (tad@corboydemetrio.com)
Michael K. Demetrio, Esq. (mkd@corboydemetrio.com)
Daniel S. Kirshner, Esq. (dsk@corboydemetrio.com)
*Attorneys for Winston*

Mary A. Wells, Esq.           (mwells@warllc.com)
Marilyn S. Chappell, Esq.     (mchappell@warllc.com)
*Attorneys for Cessna Aircraft Company*

Thomas J. Byrne, Esq.         (tbyrne@byrnekiely.com)
John C. Knudsen, Esq.         (jck@byrnekiely.com)
Kevin R. Kennedy, Esq.        (krk@byrnekiely.com)
*Attorneys for Martinair, Inc.*

Bruce A. Lampert, Esq.        (Balampert@schadenlaw.com)
*Attorney for Wightman*

                                              s/*Mark S. Pestal*
                                              United States Attorney's Office